CASE 42—PROCEEDING BY THE MADISON COUNTY FISCAL COURT TO CONDEMN THE R. & L. TURNPIKE ROAD COMPANY.—DEC. 17.

# Richmond & Lancaster Turnpike Co. v. Madison County Fiscal Court.

114  351
f136  739

### APPEAL FROM MADISON CIRCUIT COURT.

FROM A JUDGMENT FIXING THE VALUATION OF THE PROPERTY THE TURNPIKE COMPANY APPEALS. REVERSED.

EMINENT DOMAIN—TURNPIKE ROADS—CONDEMNATION—JUST COMPENSATION—METHOD OF ASCERTAINING VALUE—JUDGMENT OF CHANCELLOR.

Held: 1. Where the evidence is conflicting the judgment of the chancellor will not be disturbed unless he has proceeded on an improper basis in determining the value of the property in controversy.

2. In a proceeding under Kentucky Statutes, section 4748b, to condemn a turnpike road, evidence of the fact that the $20,000 worth of stock of the turnpike company was selling at par, taken in connection with section 242, Kentucky Constitution, providing that just compensation must be made by corporations or individuals taking private property for public use, and the Act of March 17, 1896, providing for the appointment of county commissioners to determine the value of turnpike roads condemned by the county courts, the measure of just compensation to be paid a turnpike company is, its actual value at the time of the condemnation and not what it would cost to construct a turnpike at that time.

J. A. SULLIVAN, for appellant.

J. TEVIS COBB, for appellee.

    (No briefs.)

OPINION OF THE COURT BY JUDGE HOBSON—REVERSING.

This was a proceeding to condemn the Richmond and Lancaster Turnpike Road, under the act of March 17, 1896 (see Kentucky Statutes, section 4748b) ; and the only question in the case is, what is a fair and just compensation to the owners for the proprty? In the circuit court, by consent of parties, it was transferred to equity, and heard by the court on both the law and facts as an equity action. The court fixed the value of the property at $16,000, and gave judgment for this amount, with interest from August 4, 1897, the date when the county took possession of the road, under an agreement that the value of the property and franchises should be determined by law, and that interest should be paid from this date on the amount finally fixed as the value of the property.

It is insisted by appellee that, under the rule established by this court, the evidence being conflicting, the chancellor's judgment can not be disturbed on the facts. There is great force in this contention, if he proceeded upon the proper basis in determining the value of the property; but, if he

proceeded on the wrong basis, little weight can be attached to his finding; for the reason that, if he had adopted the right basis, he might have reached a very different conclusion. His judgment is in these words: "This cause came on and was heard by the court, and, being sufficiently advised, is of the opinion that the basis of valuation of the property taken in this cause, as it was a dividend paying road, is what is would cost to produce the turnpike road in the condition it was on August 4, 1897; and the cour tthere- fore adjudges that the Richmond & Lancaster Turnpike Road Company recover of the Madison county fiscal court the sum of ($16,000) sixteen thousand dollars, with interest thereon from August 4, 1897, until paid."

By section 242 of the Constitution it is provided: "Municipal and other corporations and individuals invested with the privilege of taking private property for public use shall make just compensation for the property taken, injured or destroyed by them; which compensation shall be paid before such taking, or paid or secured at the election of such corporation or individual before such injury or destruction." Construing the constitutional provision on this subject in Railroad Co. v. Dickerson, 56 Ky., 178, 66 Am. Dec., 148, this court said: "The Constitution declares that no man's property shall be taken or applied to public use without just compensation being previously made to him. And according to the construction given to this provision in the cases of Sutton's Heirs v. City of Louisville, 5 Dana, 28, and Rice v. Turnpike Road Co., 7 Dana, 81, the compensation secured to the owner is the actual value in money of the property taken from him, which can not be diminished by any speculative advantage he may derive from its appropriation to the public use." Again, on page 178,

56 Ky., 66 Am. Dec., 148, the court said: "The Constitution secures to the owner of the land just compensation for his property before he can be deprived of it. Its value to him, considering its relative position to his other lands, and the other circumstances which may diminish or enhance their value, can alone afford him a just compensation for its loss." In Robb v. Turnpike Road Co., 60 Ky., 117, this decision was approved. In that case the owner offered to prove what the land sought to be condemned was worth to him. The trial court excluded the evidence, and this was held error. The court said that the owner was not authorized to fix a fanciful estimate of the value of the property, and make that the criterion of his recovery, but that the inquiry was, "What would be its value to him, situated as it is, if he were not the owner of it, but owned the adjacent property, under the circumstances as they now exist." Again, in Asher v. Railroad Co., 87 Ky., 391, (10 R., 185) 8 S. W., 854, the court said: "The owners must be placed in the same condition, in a pecuniary point of view, that he would be if the land was not condemned." The precise point raised in this case was not involved in either of these cases, but the principle is the same. When private property is taken for public use, the owner must be placed in as good a situation financially as he was before it was taken. Otherwise, to the extent that this is not done, his property has simply been confiscated for the use of the public. The question, therefore, is not what it would cost to produce the turnpike road in question in the condition it was in on August 4, 1897, but what was the real value of the property as it stood on that date.

The proof for the appellee showed that it had cost $20,000 to build the pike, but that it was not in as good condition as new, and that a pike like it could now be built for about

$1,300 a mile.    There were twelve miles of the pike, which, at $1,300 a mile would amount to $15,600, and the court seems to have made this evidence the basis of his judgment. On the other hand, it was shown by the appellant that the road, after paying all expenses, and appropriating a considerable sum annually for the keeping up of the property, had paid for a number of yeares dividends averaging nine per centum annually.    During this time the roadbed was improved, from the fact that they used a superior quality of metal to what was used originally.    There was no complaint at any time that the road was out of order.  The company was never indicted, and the pike was regarded as one of the best in the county.    There were a number of other pikes that were feeders to it.    The geographical condition of the surrounding country was such that a turnpike could not well be built.    The road ran through one of the best sections of Madison county, where land was sold high.    The travel on the pike was increasing with the population.    The stock for a number of years had sold at par, or more than that, and was in great demand.    The charter of the company was granted before the act of 1856 reserving to the Legislature the power to amend laws subsequently passed.    The amount of the capital stock in the company was $20,000. There is some proof that the metal on the pike had worn, and was not as thick as originally; still there is no doubt, from the evidence, that the company could have declared a dividend of six per centum annually out of its earnings, and with the remainder, in a few years, had the metal as thick as was desired; and we are by no means sure, from the proof, that the trouble with this pike was not due to the fact that when the county took charge the company had not made its usual annual repairs,—a thing which in the ordinary course of business was done in the fall,— and after

the county took charge it received no attention for several years, and during that time was used very hard, as it was a free pike.    But however, this may be, we are satisfied from the evidence that the property was intrinsically worth $20,000 on the 4th of August, 1897, for we know of no better way of determining the value of a thing than its actual market price, and this stock had concededly sold for par for a number of years, and was eagerly sought at that price.    Beside its roadbed, the company had a right of way thirty feet wide, which was fenced in.    It had an established trade.    At Silver Creek, a point on the pike, there were two large distilleries.    The principal part of the tobacco raised in Madison county was raised in that section, and the road had more travel upon it than any other two pikes in the county.    The statute under which the proceeding was had clearly contemplates that all these matters shall be taken into consideration, and that the actual value of the property shall be awarded to the owners.    In section 13 it provides: . "It shall be the duty of said commissioners to view the road to be taken and require the owner or owners thereof to produce the books or other evidences, the receipts and expenditures on the road or part of the road to be sold, amount of net earnings for said turnpike road company for each year for the past six years, and they shall hear any other evidence conducing to show the value of the property sought to be taken, and shall award to the owner or owners thereof the actual value of the property taken in said county."

There is testimony on behalf of the county to the effect that if all the other pikes had been made free, and this one had remained in the hands of the owners as a tollroad, it would have been much less valuable than formerly.    On the contrary, there is testimony for the company that this

would have increased its business, for the reason that there was no other way for the bulk of its trade to get out, and that, if the pikes which fed it were made free, more persons would have traveled it than when they had to pay toll on these pikes.    But this matter is, in our judgment, immaterial, for the reason that the county had voted for free pikes; and it was not contemplated that the people of any section of the county should pay taxes to make the other pikes in the county free, and still have to pay toll on the pike they used.    It is also immaterial that the county might have built a pike for $1,300 a mile.    It did not propose to build such a pike.    It proposed to take appellant's pike, and, when it did so, it must pay appellant the real value of the property at the time of the taking.    Any other rule would permit spoliation of private property when taken for public use.    The act provides that the proceeding under it shall be the same as under the act for the condemnation of private property by railroads, and precisely the same principle must be adopted here as would be if a railroad company had condemned this turnpike and right of way for a railway. The private property of the citizen is sacred, but private interest must  give way to the public good when the thing itself is required for the public use. He must in such case part with his property for the public good, but, under the Constitution, when he does so part with it he must be made whole; and a pecuniary consideration must be paid to him, of such amount that he will be as well off pecuniarily after the taking as he was before.    We are therefore of the opinion that the circuit court erred in the basis he adopted for fixing the value of the property, and that, upon the proper basis, its value should be fixed at $20,000.

Judgment reversed and cause remanded, with directions

to enter a judgment in favor of appellant for $20,000 with interest from August 4, 1897.

Whole court sitting except Judge Burnam.

Petition for rehearing by appellee overruled.